Mr. Cohen. My name is Eric Cohen. I represent the appellant Ramon Colbena Duenas. The issue for the court to decide this morning is whether the government proved beyond a reasonable doubt that Mr. Colbena knew that the special work that he alluded to in his text message involved counterfeit currency and I think that requirement comes from this court's decision in Charles which stated that for the government to succeed especially on the conspiracy charge initially that the government must prove that the a defendant knows the essential nature of the conspiracy and certainly the same analysis would apply to count to the substantive count. Mr. Cohen, if I could get to the point of what I believe you need to address for me and we haven't discussed this case and I don't know about my colleagues but the reason I think you have some difficulty with your case is everybody agrees that there was enough evidence that he knew something illegal was going on obviously. The question is whether he had a jury could reasonably find from the circumstantial evidence that he knew it was counterfeit currency that he was paying the money for when he got there and it seems to me like the reasonable common sense inference for the jury was that someone who was as experienced in crime as his co-defendant was, not Mr. Duenas but his co-defendant was, wouldn't have entrusted him to go in and pay the money if he didn't know what he was getting and couldn't check to make sure he was getting what he was getting. In other words, he wouldn't have sent him in there and said they'll give you something for all these thousands of dollars and just bring it back to me. That's not the way criminals work. He had a jury could reasonably found that he had to be instructed or knew or there's a reasonable basis for believing he knew what he was to get so he would check it before he left there and left the money with the people who were selling. Could you respond to that? Yes, your honor. And first I want to clarify a point. I think the evidence does not support an inference that this was buy money. The $5,000 was buy money. I think it was very clear that the $5,000 was a courier fee for Mr. Usada because that's what was negotiated between the co-defendant and Mr. Usada on an earlier phone call. But I think there's several responses I have to the court's question and the first is that if that is so, then it would have made sense for Mr. Kobayama to ask to see the money at the van. He never did. Well, he didn't get a chance to. As soon as he handed the money over, he got arrested, did he not? Well, actually he prompted the undercover agent to count the money. He could have said, before I hand you this $5,000... Going back to your intermediate point, why would the undercover agent have been counting his courier money? That was purchase money. Down payment purchase money, anyway. But again, the conversation was that the $5,000 was for Mr. Usada. And Mr. Usada bargained that and was the co-defendant. So it's of no consequence here that what goes down in the same transaction is $5,000 in real money is exchanged at the same time for $625,000 in counterfeit money? If Mr. Kobayama knew that he was receiving $625,000 or whatever the amount was. Let me get back to Judge Karnes's question. Why can't a not that it had to, but why couldn't they, if they drew every inference in a light most favorable to the government, that he knew the exchange was for counterfeit rather than for drugs or bearer bonds or something else? Because I think this court's case law would prohibit that. Specifically, Martinez, which is cited in our brief and which is the primary case that we rely on. Granted, Martinez does not specifically address entrustment. That's a stash house case where defendant Gomez is a convicted felon. He rides in the car to the stash house with the organizer of the purported burglary. He is armed. He has a crowbar. Then the most important part of the case for our purposes is that he took possession of the suitcases. Yeah, but where was the co-defendant during all this? With him. Where was the person who sent him in? He was with him. But so was Mr. Kobayama's co-defendant. He was not right next to him? No, he was across the street. He was across the street. But the jury would have to believe that Kobayama sent him there. He had no idea what he was going to get. No idea at all. He gives the money over and then they give him a box with three used watches in it. Says, here's what we agreed upon. And he goes back and by the time he gets across the street, the people who scammed him have left. No, no, no criminal is with the experience that this co-defendant has is going to send somebody there without him knowing what he's supposed to be getting. I think there's a reasonable inference that he did that exactly to cover himself. And I think that's why Mr. Kobayama did not... Why would he cover himself? Because it was another element of protection, a prophylactic between him and criminal responsibility. If Mr. Kobayama did not know what it was and he was arrested as he was and somehow... So Kobayama gives him money to go buy something and Kobayama doesn't know what he's buying? He doesn't know what he's picking up. There's no need for him to. So this way if Mr. Kobayama is arrested as he was, but if the co-defendant was able to get away, Mr. Kobayama could only say, I was there to pick up something. What kind of inference can a jury reasonably draw here, Mr. Cohen, from the fact that Kobayama is entrusted not just with five grand in cash, but is entrusted with the possession of $625,000 in cash? We've said repeatedly, at least in the drug smuggling context, that it's reasonable to infer that if a person is entrusted with possession of a large sum of contraband, it's not likely they would have been given that without having knowledge of what it was they were possessing. Could not a jury reasonably have inferred that he would not have been given the five grand in cash and perhaps more importantly, possession of, which obviously they anticipated, $625,000 in counterfeit, if he didn't know what the nature of the transaction was and simply was operating under the assumption that there was something illicit, but I know not what? It just seems strange, even for a typical type of transaction or for a seasoned criminal like Judge Carnes is referring to, that there is not any utterance of the word counterfeit at any time in Mr. Kobayama's presence, that he is not asked, invited to sit at the table in a restaurant when the transaction is being discussed between the undercover agent, the confidential informant and the co-defendant. How do you get that it was never mentioned in his presence? There's no evidence that it was ever mentioned. That's a different thing, is it not? You're asking us to take the fact that there was no evidence because everything wasn't recorded, there wasn't a confidential informant present at all times, that it didn't happen. The jury doesn't have to infer that. We're asking the court to find that that would have been speculation on behalf of the jury. Well, but what significance, if any, could a jury attach? Not that I would or that you would, but that a jury reasonably could attach from the fact that he speaks to Kabeza 61 times during a four-day period, albeit many of the calls were for a very short period, and perhaps more significantly, the two of them fly down from New York on the other guy's dime to meet during, for this exchange on the 11th of April. So, boy, they're having an awful lot of conversations and they're on a plane for three hours between New York City and Miami. Before they go to the restaurant, the money is flashed and the exchange is supposed to go forward. Is there any significance to be attached from the frequency of the contacts and flying down together on the other guy's dime from New York? Well, although not binding in this court, I think that the Second Circuit's analysis in Rodriguez, which is also cited in his brief, which talks about there were contacts on the days before between Mr. Rodriguez and the organizer and several contacts on the day, and the terminology that the court used there is the content of those conversations was critically absent. And because . . . No, but I guess what I'm asking, the difference there from that case and this is these guys fly down from New York City together, sit next to each other on a plane. Maybe they were talking about the New York Yankees and the sorry state of the Miami Marlins. I don't know. But could a jury not infer from that sequence of events something more? Well, I think they can infer something more than that, but not specifically that it was counterfeit. Again, they're flying to Miami, which unfortunately, as we all know, is a city known for a robust drug trade. As Special Agent Naranjo testified twice during his testimony, that the way that this deal went down, this buy bust, was very similar to the way that a drug deal came down. So if Mr. Cabeza, the co-defendant, is telling Mr. Cobaina, listen, this is what I need for you to do. This is something bad going on. We're doing something illegal. I just need for you to take this money, meet with these people, and then grab whatever they give you and bring it back to where I'm going to be sitting in the car across the street. In that case, and I see that my time is up. I'll bet you're answering my question, please. I think this case is, in some ways, similar to Lewis, where the court specifically addressed entrapment only last year. Lewis was in his car with 111 bricks of cocaine hidden in boxes in the back seat. Although his co-defendant boss was walking alongside the car, he could have taken off at any time. In fact, he did take off when he was confronted by the police. And yet, in that case, the court specifically rejected the entrustment theory that we were talking about this morning, specifically saying that his presence with the boxes was only brief, and that he was never left completely alone with them. And again, I think the only fair inference in this case is that Mr. Cobaina's possession of that possession was going to be only brief until he got back to the car, where his... Brief or not, $625,000 was consigned, would have been consigned to you, to your client. The other guy was a block or more away sitting in another car. So he's given a very valuable thing to this fellow. Yes, and I don't think there's any question that Mr. Cobaina realized he was receiving something of value. I don't, I don't think he realized he was receiving. And again... And paying for. And transferring the money for, yes. Actually, was Mr. Cobaina able to see Mr. Duenas at all times when he was in this car, or was his car beyond the vision point of the entrance to the restaurant? Well, the transaction was taking place not inside the restaurant, it was in the parking lot. No, but my question is, was he under surveillance, or could he have been under surveillance by Mr. Cobaina? Cobaina? Yeah. Yes. The record's not clear. There was no evidence that from where Mr. Cobaina was he could see, but... I thought they... Help me with this, Mr. Corwin. I thought that the evidence was that Cobaina was parked a more away from the restaurant and the parking lot where the transaction was going to go down. Did I have that wrong? Maybe I misapprehended that. My reading of the record is that he was parked on the northwest corner of the same intersection where the restaurant was. So he was across 8th Street. Now, whether he was also... Do we know how far that was from the parking lot, from the record? That's not in the record, Your Honor. Thank you. Thank you. Ms. Reed. Good morning, Your Honor. Lisette Reed for the United States of America, and I have with me at counsel's table Gerard Peoples, who was part of the trial team on this case. The evidence definitely supports the jury's conclusion that Cabeza and Cobaina Duenas were working as a team. And all of the points that Your Honors emphasized... Right, but they could have been working as a team to consummate some other illicit transaction. What you've got to prove beyond a reasonable doubt is that the defendant knew this transaction involved funny money. It isn't enough that he knew something bad was going down. He had to know that the substance of this transaction on the 471 and 472 involved the movement of counterfeit money. Absolutely, Your Honor. And what makes this case... And couldn't he have inferred from this, yeah, there was something going down here, but wasn't clear that it was money. Could have been drugs, right? Because we don't even know what was... how big the suitcase was, whether it was big enough to contain two bricks of cocaine worth 300 grand or anything like that. What we don't have to do is look at every conceivable possibility. What we have to look at is the evidence in front of us and determine whether, based upon this evidence, the jury could reasonably conclude, beyond a reasonable doubt, that he knew the purpose of this conspiracy. And here's what takes this case out of the realm of Martinez and Lewis. Our particular defendant is given the $5,000 and he is sent by himself to the parking lot to finish, to conclude, to do the most crucial part of this transaction. If he is unable to determine what it is he's going for and why he's there, then the entire transaction is not going to . . . Is that different in kind or degree from a circumstance where a co-conspirator who knows all about the transaction is walking with the car, the defendant is driving the car, and in the backseat of the car is multiple kilogram quantities of cocaine. In this case, the co-defendant is seated in his car after he consummates the transaction verbally in the restaurant. Then he leaves and has the other guy as the front guy, and he's parked nearby in his car at the end of the intersection. Do we know from the facts how far away Cabeza was from the parking lot and whether it was visible to Cabeza from the parking lot that . . . We know . . . . . . Duenas was involved in this transaction in that lot at that time? We know that it's described as approximately a block and a half away, and there is no evidence that he could see that Cabeza was in a point where he could see the parking lot. There was no evidence either way. There was no evidence that he could or couldn't. Is that right? Right. No evidence that he could or couldn't, but the evidence does seem to show that he couldn't because the officers first, during the takedown, they takedown Cabena Duenas, and when they find Cabeza, he's simply sitting in the car waiting for Cabena Duenas. Is that critical? Is that critical to the government's entrustment? That they can't . . . That they can't see. If they could see . . . I mean, the problem is entrustment typically requires that there be some distance between the kingpin and the guy you're entrusting, because if you're walking together, you're not really entrusting him. You're right there. Right. So there has to be some degree of separation. It seems to me this is kind of a unique spin on entrustment. Entrustment usually means I trust your loyalty to me. I trust your faithfulness to me that you'll carry out my plan, and I can do that by proving I trust you. I won't need to be right with you to enforce it. In this case, they may have been close enough that it would be unlikely that Duenas would have fled because he was in a strange city. He didn't even have his own car. The car was occupied by Cabeza, and so he wasn't at great risk of flight. It seemed to me the entrustment here was different. Not I trust your loyalty, but that I trust your competence. I trust you to know that you're buying and getting what I'm giving you this money to buy and get. And so I don't know that any entrustment case in the 11th Circuit has yet gone to entrustment not of your loyalty, but rather to trust your competence. But it seems to me he had to have trusted the competence of Duenas because otherwise Duenas could have given the money, and then the seller, Cabeza, could have easily fled. He knew the town. He probably had his own car, and then the money goes to entrusting the competence of your co-conspirator as opposed to entrusting to the loyalty of your co-conspirator. That's an interesting question. In response to the entrustment, I do think the entrustment was both here. Not only did Cabeza, who's sitting calmly in the car, but he knew that Cabeza knew what he was doing or else he wouldn't be sitting there calmly. That's the key difference. But my question is, do you have any cases involving entrustment where there never was any physical separation? That is, I didn't worry about the other guy fleeing because I had the only method of fleeing that he had, which is I had the car. But I had to trust something else about him. Not that he wasn't going to flee, but that he was not going to screw up the deal. That he was competent to know what he was getting. That's a good question. I can do some research on that and prepare something for your honor. But at the top of my head, I'm not sure. So many of these cases are very fact specific that it's hard to draw that actual distinction between entrustment. I see your point though. Do we know how much time elapsed between the time they bust the defendant in the parking lot and when they arrest Cabeza sitting in the car a block and a half away? It's not precise, but we know that it is almost simultaneously. It is pretty quickly. There's just no way to know from this record exactly. The fact that he didn't flee doesn't, you can't infer anything from that. Well, you can infer that he did not actually see the takedown because if he saw the takedown, he would. Yeah, although it may have happened so quickly that there's just not much difference in the time. Your argument is the inference ought to be drawn in favor of the verdict, right? Absolutely. And this court has the obligation. Right, so the argument to draw the circle complete is that the very fact that he did not flee after the other guy was busted in the parking lot suggests that he was sufficiently far away, that he lacked that kind of control or dominion over the guy to whom he had entrusted five grand and presumably had planned to entrust 600 grand more. Absolutely. Okay. Was the arrest outside the car? Did they take? Yes, this happened outside of the van. So while the gentlemen are all standing in the parking lot, and there's a video of this so you can see this in the record, Mr. Caboina-Denas hands the money over to our undercover officer who starts counting it. And you see them standing there in the parking lot. And then Caboina-Denas says, here, of course, it's all there. Count it. He knows how much the money is supposed to be. And he says, count faster when he realizes that the undercover is actually counting. And then you hear... What inference would you have us draw from the fact that he elicited undertaking? But does that shed any light about his knowledge of the nature of the undertaking? No, that fact alone, the count faster, is not... Just shows that he's concerned that something's going down that isn't quite right. That's correct. Totally an accumulation of facts here. Give us and give the jury the comfort level, the reasonable belief that he knew what was going on. The amount of time they spent together, as your honor pointed out, the three hours of traveling, the 61 phone contacts. This is a team. These are two men working as a team, one the money man and one the negotiator. And the jury can see that based on the accumulation of facts. And that's how the jury can reasonably come to the conclusion that he knew the object of this conspiracy. When we talk about the Lewis case, as your honor brought up, there was a big difference where we have a gentleman who we can see works for Borgella, Borgella being the main drug trafficker. He works as a clerk at a shipyard. And so the fact that two boxes are put into a car that he's driving, they're sealed boxes, is not conclusive of his knowledge. In this case... Because in that case, which the defendant says is the strongest case, much of what the defendant there, Martinez, was doing was legitimate, we presume. Legitimate as part of his job as a clerk. Yeah, right. I mean, he was probably carrying boxes all day long that didn't have illegal things in it, because that was part of his legitimate job. And so it seems to me it's much harder to draw an inference of illegality there, or the knowledge of what the illegality is than in our case. I think that's quite distinguishable. Absolutely. I agree, your honor. Anything else, mistress? If we have no further questions... I have just one. This prudent smuggler doctrine usually arises in the context of consigning drugs to somebody from which the courts have regularly inferred that you wouldn't give it to someone with a great value without letting them know what it was they were possessing. Has that doctrine ever been applied to a context different from drugs, like counterfeit or bearer bonds or something else, but not contraband that was a controlled substance? I'm sure it would have been. It certainly is a reasonable... I mean, do you know of any case... I understand that. I'm just asking, have you come across any case where we've actually done that, that we've applied it not in a drug context, but in a non-drug context? I can't think of any off the top of my head, your honor. Thank you. Definitely something we can't extend it to in this case. If there are no further questions, we'll rest on the issues as we brief them. Thank you, your honor. Mr. Cohen. Thank you. In answer to the question about where Mr. Cabeza was, page 116 of the transcript of the first day of trial, where was Milton Cabeza, where was he arrested? He was arrested on the north side of Southwest 8th Street in Ponce de Leon, and so on the actual northwest corner of the intersection, and that being the same intersection as the parking lot. In response... So the parking lot is on the same street? It's on Ponce and 8th, so it may be a different corner of the intersection, but it was the same intersection. In response to some of the questions by the court, first, Judge Ebel, in Lewis, there was an additional factor that would suggest knowledge of illicit activity, and that's that he fled. But Lewis is not the case that I was referring to as our strongest case. Martinez is a different case. Martinez is the stash house case where the gentleman actually went inside and took the suitcases while armed. Right, but there, it struck me that in Martinez, he wasn't really doing anything. He was just kind of standing around, right? Martinez actually picked up the suitcases while he was armed after opening up, gaining entry by crowbar. But he, in that case, was... I mean, he didn't act independently in any way, did he? No, he was with co-defendants. Yeah. So the case, in response to another question by Your Honor, having to do with cases that deal with entrusting competence, not necessarily loyalty. I haven't found a case from this circuit, but again, going back to the second circuit, there's a case by the name of Torres, which is also cited in our brief, where the defendant there was generally accompanied by somebody except at the critical time when he went into the UPS store to recover the packages. At that time, there was somebody waiting in a minivan outside in the parking lot. But when Torres entered the store, as he had done all day trying to recover these packages that were sent in his name, which contained significant amounts of cocaine, he was by himself. And in that case, actually, the driver took off and left him by himself. But for a period of time, a momentary period of time, he was the ... But don't you see, that's the distinction between this case and that case. The driver didn't take off here. Her argument is two possibilities. Either the co-defendant could see what was going on at the van, and therefore, there's no rational explanation for him not driving away when the arrest occurred. Or he couldn't see, and therefore, you have entrustment of competency as well as loyalty. That's her logic, and it sounds fairly logical to me. But there's a third possibility, is that Corbeza was arrested before he had an opportunity to drive away. This all happened in a very short- Is there any evidence of that? I think that the evidence from Agent Naranja, and I'm not sure of the exact number, but there was more than 10 agents involved in this surveillance. Right, but there's no question there's a gap in time between the bust in the lot and the arrest of Corbeza in the car a block or more away. And I would have thought that if I was sitting in the car watching the transaction and I see the arrest go down, boy, I'd hit the pedal and be out of there awfully quickly. Especially, Your Honor, I don't know if the record supports that. I don't know if there was any gap in time. Corbeza was being surveilled. There were people out. There were people around and in the parking lot, including Agent Naranja. It's very possible that once the arrest signal went down, the whole purpose of the arrest signal, they didn't need it to arrest Mr. Corbeza. He was right in front of the undercover officer. The whole purpose of the arrest signal being sent out by the undercover was so that Mr. Corbeza could be arrested. So I think that the fairer inference, again, is that he was arrested immediately. Let me tell you the problem with the it's possible and a fair inference could be drawn. Our law is firmly, firmly established that you don't have to exclude every reasonable hypothesis of innocence. So long as there's a reasonable hypothesis of guilt for the jury from the evidence, their verdict wins, whichever way it goes, of course. We don't review the acquittals, but a verdict of conviction is to be upheld so long as there's a reasonable hypothesis of guilt, even if there are competing reasonable hypotheses of innocence. In response to that last point, I think the statement or the standard of review that the court applied in Lewis, I have never seen it phrased this way, but I think it's very telling. The court there said, if the evidence viewed in the light most favorable to the prosecution is equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, then a reasonable jury must necessarily entertain a reasonable doubt. Here, there is equal possibilities that this was a counterfeit deal, that it was a drug deal, that it was a gun deal, that it was a stolen property deal. So applying the standard that the court applied in- Right, but the difference in Lewis is that Lewis wasn't involved in the actual exchange. Here you've got your client exchanging five grand for what would have been $625,000 in counterfeit money. You don't have anything like that in Lewis. No, we don't, Judge. But frankly, this whole situation could have been averted if law enforcement at the van just said, do you want to see the money? Do you want to see the fakes? Do you want to see what we have? Then there would have been no question. The fact that that wasn't done and more importantly, the fact that Mr. Cobain- You can't say that the evidence is insufficient because the government could have constructed the case in a way that would have been stronger. And I agree with you, Your Honor, which led to my final point that I was just about to make and something I had already spoken about earlier. If part of Mr. Cobain's responsibility was to confirm that he was receiving $632,000 worth of counterfeit money, the simple thing for him to do would have said, can I see what's in the bag? Can I see the money? He never did that. He offered for the agent to count the money, told him to do it faster. There was a period of time there, but not once did he say at any time in the restaurant or out, I want to see the money before I give you this legitimate $5,000 in cash. I think that's what distinguishes this case from a lot of other cases. Thank you, counsel. We'd like to run over, but we'll take the case under submission. Next case up is United States-